# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A25-0382

State of Minnesota,
Respondent,

vs.

Tommy Eastman,
Appellant.

**Filed December 1, 2025**
**Affirmed**
**Wheelock, Judge**

Anoka County District Court
File No. 02-CR-22-4786

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Brad Johnson, Anoka County Attorney, Wendy O. Sanchez, Kelsey R. Kelley, Assistant County Attorneys, Anoka, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sean Michael McGuire, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bentley, Presiding Judge; Wheelock, Judge; and Larson, Judge.

## SYLLABUS

The 2023 amendment to Minnesota Statutes section 609.14, subdivision 1(a), does not create a new or heightened standard that requires a district court, before it may revoke a defendant's probation, to make any findings that rehabilitation has failed additional to or different from those currently required by existing caselaw.

**OPINION**

**WHEELOCK**, Judge

Appellant challenges the district court's order revoking his probation, arguing that the district court abused its discretion by (1) violating his constitutional right to an impartial judge when it conflated his case with another defendant's criminal case, (2) failing to properly consider the *Austin*[1] factors when revoking his probation, and (3) failing to find that all attempts at rehabilitation had failed before revoking probation in violation of Minnesota Statutes section 609.14, subdivision 1(a) (2024). We affirm.

**FACTS**

In August 2022, respondent State of Minnesota charged appellant Tommy Eastman with criminal sexual conduct in the first degree in violation of Minnesota Statutes section 609.342, subdivision 1a(e) (2020), for sexually assaulting a 12-year-old child, Child A.

Eastman pleaded guilty to the offense. At the plea hearing, Eastman admitted that he used Snapchat to coordinate with another adult male, D.B., to give D.B. a ride "to go see [D.B.'s] girl," Child A, and bring them all back to D.B.'s residence. Eastman admitted that, once he and D.B. picked up Child A, they returned to D.B.'s residence and the men took turns penetrating her. Later, at the sentencing hearing in August 2023, counsel for the

---

[1] The district court must make three findings before it may revoke a defendant's probation following a violation. *See State v. Austin*, 295 N.W.2d 248, 250 (Minn. 1980). "[T]he court must 1) designate the specific condition or conditions that were violated; 2) find that the violation was intentional or inexcusable; and 3) find that [the] need for confinement outweighs the policies favoring probation." *Id.*

state noted that Eastman participated in the penetration of Child A as "payment" for giving Child A and D.B. a ride to D.B.'s home. The district court granted Eastman's motion for a downward dispositional departure and imposed a sentence of 144 months' imprisonment stayed for 30 years of supervised probation with conditions.

In September 2024, Eastman's probation officer began receiving reports that Eastman was violating his probation conditions by using an unapproved cell phone, using Snapchat, residing at an unapproved address, and having unapproved contact with minors. The district court held a probation-violation hearing at which Eastman admitted each of the alleged violations.

After Eastman admitted the allegations, counsel for the state argued for execution of the imposed sentence. Counsel for the state reminded the district court of the details of Eastman's offense, including Eastman's use of Snapchat to arrange to pick up Child A from her home and his subsequent "penetration of this 12-year-old with another adult male present." Counsel for the state also asserted that Eastman had been "lying to [his probation officer] and hiding information" since the start of his probation, including by using Snapchat to reach out to "many, many females" for dating purposes and saving to his Snapchat account a photo of Eastman and a female who appeared to be a minor of similar age to Child A.

Eastman's counsel requested an intermediate sanction and pointed out that it was Eastman's first violation, he was "only 23 years old," and he "does not have [an] extensive criminal history." Eastman's counsel said that Eastman understood the "severity of his mistakes" and would provide value to the community if granted an intermediate sanction.

3

After hearing arguments from each party, the district court made an oral finding on the record that the need for confinement outweighed the policies favoring probation. Specifically, the district court observed that Eastman was in violation of the most significant of his probation conditions: "use of chat lines, [not] maintaining his residence, [and] having unauthorized cell phones." The district court executed Eastman's 144-month sentence.

Eastman appeals.

## ISSUES

I.     Did the district court violate Eastman's due-process right to an impartial judge by considering, when revoking Eastman's probation, the actions of another defendant in committing a different offense?

II.     Did the district court abuse its discretion by determining that the need for confinement outweighs the policies favoring probation?

III.     Did the legislature's 2023 amendment to Minnesota Statutes section 609.14, subdivision 1(a), create a new standard for probation-violation proceedings that requires a district court to determine that all possible options for rehabilitation have been exhausted before it may revoke probation?

## ANALYSIS

**I.     The district court did not violate Eastman's procedural due-process right to an impartial judge by considering, when revoking Eastman's probation, the actions of another defendant in committing a different offense.**

Eastman argues that his constitutional right to due process was violated because the district court exhibited bias when it considered the underlying offense of another defendant as a basis for revoking Eastman's probation. Eastman contends that he was thus "deprived

4

of a neutral and detached decision maker." Eastman did not raise this issue at the probation-violation hearing.[2]

To conform with standards of procedural due process, a defendant on probation has a constitutional right to a hearing before their probation can be revoked. *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (determining that the due-process procedure outlined for parolees in *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972), also applies to probationers). At such a hearing, the issue of revocation must be determined by a "neutral and detached" decisionmaker. *Pearson v. State*, 241 N.W.2d 490, 492 (Minn. 1976) (quoting *Morrissey*, 408 U.S. at 489).

To succeed on this claim, Eastman must prove that "a reasonable examiner [with full knowledge of the facts and circumstances] would question the judge's impartiality." *State v. Cleary*, 882 N.W.2d 899, 904 (Minn. App. 2016) (stating that whether a judge is biased during a probation-violation hearing is not based on whether the judge was actually biased, but whether a reasonable examiner would question the judge's impartiality); *see also State v. Lopez*, 988 N.W.2d 107, 117 (Minn. 2023) (discussing three distinct types of bias that may exist when a district court acts as fact-finder and stating that emergent-bias concerns arise when "the trier of fact is not actually biased, but during the [proceeding], something happens that transforms it into a partial trier of fact"). When a district court sits as a finder of fact, it is obligated to set aside personal knowledge and decide cases based

---

[2] We need not determine whether plain-error review applies to this issue because we conclude that there was no error at all, given that the district court's statements did not reflect either actual bias or the appearance of bias against Eastman.

solely on the merits of the evidence presented in the proceeding before it. *Lopez*, 988 N.W.2d at 119-21; *see also State v. Dorsey*, 701 N.W.2d 238, 250 (Minn. 2005) (establishing that, if the record demonstrates that a district court conducted independent investigation of information outside of the record to decide the case, the court's impartiality would reasonably be questioned). We review "whether a district court deprived a defendant of [the] right to a fair trial and an impartial fact-finder de novo." *Lopez*, 988 N.W.2d at 120.

Eastman asserts that the district court exhibited bias when it considered the "actions of another individual," pointing out that the district court mentioned Eastman's use of Snapchat and that it then relied on information outside of the record. Eastman claims that he "was not involved with using Snapchat to solicit minors" and that, therefore, the judge must have confused his case with another defendant's case or "used her knowledge of [another defendant's] case to inform her decision" to revoke probation. But the district court's statements at the hearing do not demonstrate that the district court considered any use of Snapchat in making its probation-revocation decision other than that to which Eastman admitted during his plea.

During the hearing, counsel for the state properly recited the facts of Eastman's offense, specifically that Eastman used Snapchat to coordinate the assault of Child A: "[W]hat Mr. Eastman was convicted of included using Snapchat, using social media to arrange for pickup of this 12-year-old where he was engaging in penetration of this 12-year-old with another adult male present." While Eastman suggests that the district court conflated his case with that of another defendant charged with assaulting Child A,

6

there is no indication in the record that the district court relied on evidence of events outside Eastman's underlying offense and probation violations when it revoked his probation. The district court properly considered arguments from the state and Eastman, testimony from the probation officer, and the factual basis for Eastman's plea and found that the need for Eastman's confinement outweighed the policies favoring probation.

To support his argument, Eastman relies on *Cleary*, in which we determined it was error for the judge who presided over Cleary's case in drug court to also preside over his probation-violation hearing in district court. 882 N.W.2d at 901-02. We reasoned that the participation of the judge in both proceedings could risk injustice to the parties and undermine public confidence in the judicial process. *Id.* at 908. But Eastman's reliance is misguided because *Cleary* is factually distinguishable.

In *Cleary*, we explained that the "unique structure" and purpose of drug court changes the relationship between judge and defendant and is different than that in other courts. *Id.* at 906. Drug court judges interact with defendants on a much more personal level than is typical in other court settings. *Id.* at 905. As part of the drug court program, Cleary submitted a journal that detailed his feelings and personal life once a week to the judge; the drug court team also celebrated Cleary with a party when he reached one year of sobriety. *Id.* In addition, there is no "formal record" for drug court, so there is no "reviewable record" for many of the interactions between the judge and a defendant regarding the defendant's participation in the program. *Id.* at 906. For those reasons, we concluded that there was opportunity for the appearance of partiality if a drug court judge

7

presided over a probation-violation hearing for a defendant the judge oversaw in drug court. *Id.* at 908.

Unlike in *Cleary*, the record here does not suggest a relationship between Eastman and the district court judge that would show any appearance of partiality; indeed, there is no assertion of any relationship between them at all. Furthermore, we see no indication that the judge relied on personal knowledge or information outside of the record to revoke Eastman's probation. During the probation-violation hearing, the district court recalled Eastman's sentencing as part of a "very egregious case with a number of young men that were all involved in transporting basically by Uber, if I remember correctly—paying for an Uber to get a young girl to various residences where the men had sex with her." We are not persuaded that this reference shows the district court conflated Eastman's case with that of another defendant because, while the use of an Uber was not present in Eastman's case, Eastman admitted at his plea hearing that he gave Child A and D.B. a ride to D.B.'s residence and that D.B. and Eastman took turns having sexual intercourse with Child A. We thus conclude that any reasonable examiner with full knowledge of the facts and circumstances of the case would not question the judge's impartiality.

Eastman has not shown that the district court relied on facts outside the record, and therefore, we discern no bias.

**II.    The district court did not abuse its discretion in determining that the need for Eastman's confinement outweighs the policies favoring probation.**

Eastman argues that the district court abused its discretion when it revoked his probation by (1) failing to analyze the *Modtland* subfactors and (2) improperly weighing

the significance of his violations based on evidence from another defendant's case. We address each argument in turn.

"The [district] court has broad discretion in determining if there is sufficient evidence to revoke probation and should be reversed only if there is a clear abuse of that discretion." *Austin*, 295 N.W.2d at 249-50. But whether the district court made the required findings to revoke probation is a question of law that we review de novo. *State v. Modtland*, 695 N.W.2d 602, 605 (Minn. 2005). To revoke probation, a district court must make specific findings on what are known as the *Austin* factors. *Austin*, 295 N.W.2d at 250. The court must (1) identify the specific condition of probation violated, (2) determine that the violation was intentional or inexcusable, and (3) assess whether the need for confinement outweighs the policies favoring probation. *Id.* When analyzing the third *Austin* factor, the district court must further consider three subfactors known as the *Modtland* subfactors and must make findings as to whether

> (i) confinement is necessary to protect the public from further criminal activity by the offender; or
> (ii) the offender is in need of correctional treatment which can most effectively be provided if [they are] confined; or
> (iii) it would unduly depreciate the seriousness of the violation if probation were not revoked.

*Modtland*, 695 N.W.2d at 607 (quotation omitted). A district court needs to find only one *Modtland* subfactor to support a finding favoring confinement on the third *Austin* factor. *State v. Smith*, 994 N.W.2d 317, 320 (Minn. App. 2023), *rev. denied* (Minn. Sept. 27, 2023).

9

The decision to revoke probation "cannot be a reflexive reaction to an accumulation of technical violations but requires a showing that the offender's behavior demonstrates that he or she cannot be counted on to avoid antisocial activity." *Austin*, 295 N.W.2d at 251 (quotations omitted). District courts must make "thorough, fact-specific records" and "seek to convey their substantive reasons for revocation and the evidence relied upon." *Modtland*, 695 N.W.2d at 608.

Eastman argues that the district court did not make any findings pursuant to the *Modtland* subfactors and that, therefore, its finding on the third *Austin* factor—whether the need for confinement outweighs the policies favoring probation—was not supported. The record belies Eastman's assertion.

Eastman admitted to multiple probation violations, including (1) possessing an unapproved cell phone, (2) using Snapchat, (3) residing at a location where he was not registered, and (4) having contact with minors without prior approval. On the first *Modtland* subfactor, the district court found that, due to the seriousness of his underlying offense and number of significant probation violations, Eastman was not amenable to probation and his confinement was necessary to protect the public from further criminal activity.

Eastman was using Snapchat as a dating service to "contact more young women" only eight months after he pleaded guilty to a criminal-sexual-conduct offense that involved using Snapchat to facilitate his sexual assault of a 12-year-old child. At the probation-violation hearing, Eastman admitted that he used his Snapchat account to find people whom he wanted to date. But at his plea hearing, Eastman had admitted that he and

10

D.B. used Snapchat to communicate with each other to coordinate the retrieval of Child A from her home and that, after he picked up D.B. and then Child A from her home and gave them a ride to D.B.'s home, he sexually penetrated Child A. Snapchat played a substantial role in Eastman's assault of Child A.

The significant violation of using Snapchat as a dating service on an unapproved cell phone supports the district court's finding on the first *Modtland* subfactor. In support of its finding, the district court stated:

> The need for confinement at this point, in light of the seriousness of the underlying case for which he was given probation, and he was given probation over the State's objection, and the violations here that have occurred, which is apparently having an unapproved cell phone and utilizing that cell phone to attempt to contact more young women, the Court finds that the need for confinement is outweighed by the policies favoring probation. There's no indication that Mr. Eastman could be or can be supervised on probation since he was in violation of the most significant of conditions, that being no use of chat lines, maintaining his residence, having unauthorized cell phones.

As this was a clear violation of the probation condition prohibiting use of social media, the district court did not abuse its discretion in finding that Eastman's violation was significant and that the need for confinement outweighs the policies favoring probation because it "is necessary to protect the public from further criminal activity" by Eastman. *See Modtland*, 695 N.W.2d at 607.

Eastman also argues that the probation conditions he violated were given more weight than they deserved because the district court conflated his case with that of another defendant who committed a more severe offense. Eastman highlights the weight the

11

district court placed on his use of Snapchat while on probation as proof that it was confusing his case with that of another defendant. The record, however, supports the state's recitation of the facts, and as previously discussed, the use of Snapchat played a significant role in Eastman's underlying offense. There is no evidence to support the assertion that the district court considered the facts of another defendant's case when weighing Eastman's probation violations.

Because the district court properly considered the first *Modtland* subfactor when determining whether the need for confinement outweighs the policies favoring probation in its decision to revoke Eastman's probation, we discern no abuse of discretion that would support a reversal of the district court's revocation decision.

**III.    The 2023 amendment to Minnesota Statutes section 609.14, subdivision 1(a), does not create a new standard for the revocation of probation.**

Eastman also challenges the district court's order revoking his probation by arguing that Minnesota Statutes section 609.14, subdivision 1(a) (2024), requires a district court to find that all possible rehabilitation has failed before it may revoke probation. In 2023, the Minnesota Legislature amended subdivision 1(a) to include the sentence, "Revocation shall only be used as a last resort when rehabilitation has failed." 2023 Minn. Laws ch. 52, art. 17, § 32, at 1114. Eastman asserts that this amendment demonstrates the legislature's intention to establish a new standard for the revocation of probation distinct from that established by *Austin*: that a district court must find that all possible attempts at rehabilitation have failed before revoking probation. This argument requires us to interpret the 2023 amendment to Minnesota Statutes section 609.14, subdivision 1(a).

12

Statutory interpretation is a question of law we review de novo. *State v. Holl*, 966 N.W.2d 803, 808 (Minn. 2021). "Our objective in statutory interpretation is to effectuate the intent of the legislature." *State v. Riggs*, 865 N.W.2d 679, 682 (Minn. 2015) (quotation omitted). Our analysis begins by considering whether the statutory language at issue is ambiguous. *Roberts v. State*, 945 N.W.2d 850, 853 (Minn. 2020). A statute is ambiguous if it is "subject to more than one reasonable interpretation." *Id.* "To determine whether a statute is ambiguous, we first construe words and phrases in the statute according to rules of grammar and according to their common and approved usage." *Fordyce v. State*, 994 N.W.2d 893, 897 (Minn. 2023) (quotations omitted). If the language of the statute is not ambiguous on its face, we apply its plain meaning. *Id.* If, however, the language of the statute is susceptible to more than one reasonable interpretation, we apply the canons of construction to ascertain the statute's meaning and "resolve the ambiguity." *State v. Thonesavanh*, 904 N.W.2d 432, 435 (Minn. 2017).

The language at issue here is the sentence, "Revocation shall only be used as a last resort when rehabilitation has failed." Minn. Stat. § 609.14, subd. 1(a). Eastman argues that the plain language of the sentence requires a district court to maintain a defendant on probation "unless all [possible] attempts to rehabilitate the defendant have failed." In other words, he argues, "[u]nless the probationer is so incorrigible that all attempts at rehabilitation have failed, the court may not revoke probation."

Based on the legislature's use of the word "shall," it is reasonable to construe the amendment as imposing a mandatory duty on the district court. *See* Minn. Stat. § 645.44, subd. 16 (2024) ("'Shall' is mandatory."). And it is similarly reasonable to construe "when

13

rehabilitation has failed" as referring to a circumstance in which all avenues for rehabilitation have been explored and have failed. Accordingly, it is reasonable to interpret the amendment's language as precluding the revocation of probation until this condition precedent—the exhaustion of all possible attempts at rehabilitation—has been satisfied.

We conclude that it is also reasonable, however, to construe the phrase "when rehabilitation has failed" as referring to a circumstance in which the nature of a defendant's conduct in violating probation demonstrates no reasonable probability of future reform sufficient to outweigh either the risk to public safety as demonstrated by that conduct or the need for the execution of the sentence as an appropriate consequence, even if other rehabilitative opportunities remain available. Stated differently, if a defendant has been afforded an opportunity for rehabilitation but violates probation in a manner that either demonstrates an unacceptable risk to public safety or requires revocation as a proportional consequence, a district court may conclude that rehabilitation has failed notwithstanding that relevant rehabilitative programming may remain available in the community. Because we conclude that the statutory language is susceptible to more than one reasonable interpretation, it is ambiguous, and we therefore resort to the canons of statutory construction to ascertain its meaning. *See Thonesavanh*, 904 N.W.2d at 436.

We conclude that the better interpretation of "when rehabilitation has failed" is that "the offender's behavior demonstrates that he or she cannot be counted on to avoid antisocial activity" or "[t]he [defendant] has been offered treatment but has failed to take advantage of the opportunity or to show a commitment to rehabilitation." *Austin*, 295 N.W.2d at 251 (quotations omitted); *see also Thonesavanh*, 904 N.W.2d at 436

14

(discerning the meaning of a statute based on the "better interpretation"); *State v. Hayes*, 826 N.W.2d 799, 805 (Minn. 2013) (embracing the more reasonable of the two interpretations of a statute); *In re Est. of Butler*, 803 N.W.2d 393, 397 (Minn. 2011) (adopting the "better interpretation" of a statute). Such a definition is not merely practicable on its face, but it also comports with a concept that Minnesota courts have applied for the nearly 50 years since *Austin* was decided. Indeed, we conclude that the intention of the legislature in amending subdivision 1(a) was not to supplant the district courts' reliance on the *Austin* analysis when revoking probation, but rather to mandate it. We reach this conclusion for two reasons.

First, the language used in the amendment to subdivision 1(a) is substantially similar to that used in *Austin*, in which the supreme court stated that "[t]he purpose of probation is rehabilitation and *revocation should be used only as a last resort when treatment has failed*." 295 N.W.2d at 250 (emphasis added). As Eastman notes, the amendment uses "shall" in lieu of "should" and "rehabilitation" in lieu of "treatment," but we reject his argument that these alterations indicate "a departure from *Austin* and its progeny" because closer examination contradicts such a conclusion.

Although the supreme court in *Austin* used the permissive "should" in describing the restraint to be exercised in revoking probation, it nevertheless implemented a mandatory analysis that district courts must undertake in doing so. Shortly after using "should," the *Austin* court stated without qualification that the "decision to revoke . . . *requires* a showing that the offender's behavior demonstrates that he or she cannot be counted on to avoid antisocial activity." *Id.* at 251 (emphasis added) (quotations omitted).

15

And there is no indication that the supreme court in *Austin* intended to ascribe materially distinct meanings to the terms "rehabilitation" and "treatment." Because it first noted that the "purpose of probation is rehabilitation," its use of "treatment" in the following clause suggests that it intended the words to be synonymous. *Id.* at 250. And nowhere else in the opinion does the supreme court suggest that a revocation decision should focus more or exclusively on the failure of treatment programming to the exclusion of the broader concept of rehabilitation.

Second, it is significant that the legislature declined to provide any guidance to district courts in determining when "rehabilitation has failed." Given that the amended language so closely mirrors that of *Austin*'s own policy statement on the same topic, it is reasonable to assume that the legislature was fully aware of the existing caselaw governing probation-violation proceedings. *See Sterry v. Minn. Dep't of Corr.*, 8 N.W.3d 224, 232 (Minn. 2024) (stating that appellate courts "presume that statutes are consistent with the common law, and [they] do not presume that the legislature intended to abrogate or modify a rule of the common law on the subject any further than that which is expressly declared or clearly indicated" (quoting *Jepsen v. County of Pope*, 966 N.W.2d 472, 484 (Minn. 2021))). And considering that the legislature made no attempt to establish a distinct procedure for determining when rehabilitation has failed, it is likewise reasonable to conclude that the legislature did not intend to abrogate *Austin*'s analysis with the amendment, but to codify it.

This interpretation complies with the most relevant—and indeed dispositive— canon of discerning legislative intent, that courts presume that "the legislature does not

16

intend a result that is absurd, impossible of execution, or unreasonable." Minn. Stat. § 645.17(1) (2024). When we apply this presumption, Eastman's proposed interpretation also fails.

First, an interpretation of "when rehabilitation has failed" that requires the failure of "all [possible] attempts to rehabilitate the defendant" would be impossible to consistently or uniformly apply. Because rehabilitation is fundamentally a subjective and internal process, there is no practical means of determining when a defendant on probation is truly beyond rehabilitation. So long as the imposed probationary term has not expired and the defendant retains agency over their own decision-making, there is always the possibility that continued probation will bring about the desired change in thinking and behavior. Accordingly, the only way to comprehensively determine that "all attempts to rehabilitate the defendant have failed" is to do so retrospectively—only once probation has ended and the district court is no longer able to provide additional opportunities for rehabilitation could one conclude that *all* such efforts had failed.

If there is indeed a point at which all hope of rehabilitation becomes lost for a defendant prior to the expiration of probation, a district court will be unable to determine with any specificity when exactly that point has been reached, particularly if the defendant continues to profess a desire for change and an intention to take advantage of the opportunities for doing so. Thus, any conclusion that "all attempts to rehabilitate the defendant have failed" made before the termination of probation itself will necessarily entail nothing more than a district court's best guess at divining whether a defendant has exhausted opportunities for continued correctional treatment in a community setting. And

17

considering that the current iteration of the statute provides no guidance to courts in how to reach such a conclusion, it would be impractical to implement a standard for the revocation of probation that turns entirely on a district court's ability to accurately predict future behavior.

Second, applying such a construction would lead to absurd and unreasonable results because it would effectively insulate defendants from revocation—regardless of the severity or frequency of their probation violations—so long as they can demonstrate any potential for future reform. To require the exhaustion of any and all rehabilitative opportunities before a district court may revoke probation would deprive district courts of the ability to impose meaningful and proportional sanctions for violation behavior that demonstrates an ongoing risk to public safety solely because the defendant *might* do better next time. It would essentially nullify the relevance of the violating behavior itself in the determination of whether the defendant should remain in the community. Such a result is not only irrational as a matter of logic but is antithetical to Minnesota's long-standing perspective that the revocation of probation must involve "a balancing of the probationer's interest in freedom and the state's interest in insuring his rehabilitation and the public safety." *Austin*, 295 N.W.2d at 251.

Accordingly, we hold that the 2023 amendment to Minnesota Statutes section 609.14, subdivision 1(a), does not create a new or heightened standard that requires a district court, before it may revoke a defendant's probation, to make any findings that rehabilitation has failed additional to or different from those currently required by existing caselaw. In other words, a district court's determination pursuant to *Austin* that the "need

18

for confinement outweighs the policies favoring probation" is sufficient to satisfy the statutory requirement that the district court find that rehabilitation has failed before revoking probation.  295 N.W.2d at 250.

## DECISION

The district court did not act with bias or rely on information outside the record during the probation-violation proceeding and did not abuse its discretion by determining that the need for confinement outweighs the policies favoring probation and then revoking Eastman's probation.  Furthermore, the 2023 amendment to Minnesota Statutes section 609.14, subdivision 1(a), does not create a new or heightened standard that district courts must apply when revoking probation.

**Affirmed.**